IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEXAR MEDIA, INC., | No. C03-00355 MJJ |
| Plaintiff, | **ORDER DENYING FUJI PHOTO FILM U.S.A., INC.'S MOTION FOR SUMMARY JUDGMENT THAT CLAIMS 1, 2, 4, AND 7-12 OF U.S. PATENT NO. 6,262,918 ARE INVALID** |
| v. | |
| FUJI PHOTO FILM USA, INC., | |
| Defendant. | |

## INTRODUCTION

Before the Court is Defendant Fuji Photo Film, U.S.A., Inc.'s Motion for Summary Judgment that Claims 1, 2, 4, and 7-12 of U.S. Patent No. 6,262,918 ("the '918 Patent") are invalid.[1] (Doc. No. 192.) Plaintiff Lexar Media, Inc. opposes the Motion.

For the following reasons, the Court **DENIES** the Motion.

## FACTUAL BACKGROUND

The '918 Patent described a method and apparatus for enabling the erasure of multiple blocks of memory simultaneously to save time. The '918 Patent application was filed on June 30, 2000, and the Patent issued on July 17, 2001. The inventors listed on the '918 Patent are Petro Estakhri, Berhanu Iman, and Min Guo. The only claims of the '918 Patent asserted herein by Defendant are claims 1, 2, 4 and 7-12 (the "Asserted Claims"). The following three references were not of record

---

[1] Defendant also moved for summary judgment on the grounds that Claim 1 of U.S. Patent No. 6,397,314 is not infringed. However, the Court limited the parties to one motion on each parties single best theory. (See Doc. Nos. 188, 211.) As the Court previously informed the parties, the Court will only consider Defendants' Motion related to the '918 Patent.

to the U.S. Patent Trademark Office during prosecution of the '918 Patent: (1) Fuji AIMS card and/or the Ricoh RDC-1 digital camera (the "Fuji AIMS System"); (2) U.S. Patent No. 5,572,466 ("the '466 Patent); and (3) U.S. Patent No. 6,081,878 ("the '878 Patent").

AIMS is an acronym for "auto indexing mass storage." Fuji Film Microdevice Co. ("FMM") began manufacturing AIMS cards in the summer of 1994 in Japan. The AIMS cards operated in one of two modes – selected at the time of manufacture of the card itself: a standard speed (for recording still images), or a high-speed mode (designed to enable the recoding of video images). On the high-speed AIMS cards that were produced and sold by FFM, following an erase, the 70h command is transmitted, as shown in figure 9 on FH 030942, and this command reads device status which indicates whether or not the erase was successful. High-speed record mode Fuji AIMS cards were used in the record mode in the United States in capacities of 8 or 24 megabytes by a subsidiary of Richoh, Fuji's customer, at least as early at July, 1995. The Fuji AIMS cards were intended for use with Ricoh's RDC-1 digital camera, which was introduced in the United States between 1995 and 1996. The RDC-1 camera operated with a high-speed record mode Fuji AIMS card to implement its video feature.

U.S. Patent No. 5,572,466 ("the '466 Patent") was issued on November 5, 1996 from an application filed on October 6, 1993 (claiming priority to a foreign application filed on October 6, 1992).

The Court construed "super block" to mean "two or more blocks that are used to store data, the two or more blocks having addresses that are correlated with a group of logical block addresses that is determined by the number of sectors in a block." A "block" is "erasable storage for a plurality of sectors."

**LEGAL STANDARD**

**I.     Summary Judgment**

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings,

2

depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247-48. An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute might affect the case's outcome. *Id.* at 248. Factual disputes are genuine if they "properly can be resolved in favor of either party." *Id.* at 250. Thus, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in its favor. *Id.* However, "[i]f the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

## II.     Invalidity and Anticipation

A patent is presumed valid, and an attack on its validity requires proof of facts by clear and convincing evidence. *Bildex Inc. v. Kason Industruies, Inc.*, 849, F. 2d 1461, 1463 (Fed. Cir. 1988). However:

> Rebuttal of the presumption may be more easily had and more often achieved in reliance on prior art more pertinent than that considered by the examiner; but whether rebuttal is achieved requires careful consideration of whether the prior art relied upon does in truth render the claimed invention anticipated or obvious.

*Aktiebolaget Karlstads Mekaniska Werkstad v. U.S. Int'l Trade Comm'n.*, 705 F. 2d 1565, 1557 (Fed. Cir. 1983).[2]

Anticipation is a question of fact. *Scripps Clinic & Research Foundation v. Genentech, Inc.*,

---

[2] The parties here dispute whether the FUJI AIMS System, the '466 Patent or '878 Patent are more pertinent than the art before the Examiner, with Plaintiff arguing that Fuji has provided no such evidence, and Defendant arguing that all of the evidence submitted in support of its motion establish, and/or corroborate prior art that clearly anticipates the Asserted Claims and are, thus, by definition are more pertinent than the art cited during the prosecution.

3

927 F.2d 1565, 1576 (Fed. Cir. 1991). In the anticipation analysis, the prior art is viewed from the vantage point of one of ordinary skill in the art. *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F. 3d 1367 (Fed. Cir. 2002). A claimed invention is invalid for anticipation under 35 U.S.C § 102 only if all of the elements and limitations of the claim are found within a single prior art reference. *Scripps*, 927 F. 2d at 1576; *see also IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F. 3d 1377, 1381 (Fed. Cir. 2005). There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention. *Scripps*, 927 F. 2d at 1576. To find anticipation on summary judgment, the court must determine that no facts material to the question are disputed; or that even if all material factual inferences are drawn in favor of the non-movant, there is no reasonable basis on which the non-movant can prevail. *Id.* A court must also consider the standard of proof that would have to be met at trial. *Id.*

## ANALYSIS

**I.    Anticipation by the Fuji AIMS System**

Defendant first contends that the Fuji AIMS System anticipates and renders invalid the claims one and ten of the '918 Patent under 35 U.S.C. § 102(b). Specifically, Defendant asserts that the "Fuji AIMS System incorporated and publicly disclosed, more than a year before the '918 Patent's filing date, each of the limitations of the remaining asserted '918 Patent claims, including specifically a "super block," as that term has been construed by the Court. Plaintiff contends that Defendants' evidence is insufficient to show invalidity based on the sale, offer for sale, and/or public use of the Fuji AIMS System, and likewise fails to show that the super block limitation of the Asserted Claims is met by the Fuji AIMS System since, *inter alia*, Plaintiffs' expert disagrees that this limitation is met.

**A.    Sale, Offer for Sale, and/or Public Use**

35 U.S.C. § 102(b) provides in relevant part that a person shall be entitled to a Patent unless: "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . ."In this vein, Defendant offers deposition testimony of Mr. Jefferey Lengyel, marketing manager for Ricoh U.S.A.'s digital camera division. Mr Lengyel testified that RDC-1

4

cameras were first available in the United States in December of 1995, and that the RDC-1 was only capable of capturing video if an 8 or 24 megabyte AIMS card was used. The RDC-1 were offered for sale in a package with either an 8 or 24 megabyte card, and the cards were supplied by FFM.[3] Mr. Lengyel also offered testimony showing that Ricoh offered the RDC-1 for sale at in February 1996 in the United States at the Photographic Manufacturers Association annual trade show, and that he used the video mode during a meeting with a buyer from Hammacher & Schlemmer.

> Q. Did Ricoh take orders for the RDC-1 with AIMs cards at the PMA show in February of 1996?
>
> A. Yes they did.
>
> Q. How do you know that?
>
> A. I was actively involved in the presolicitation of making meeting arrangements for our key buyers that owned photographic retail stores to meet us at that show. I participated in a number of high level meetings within our conference room in the booth where saw purchase orders and business transactions being conducted.

Mr. Lengyel further testified that he used the RDC-1 with a high-speed AIMS card to make a video of his neighbor in July 1995 in Santa Monica California. Similarly, Mr. Hiroyuki Niwano, one of Fuji's employees who designed the AIMS card, publicly used the RDC-1 with a high-speed AIMS card when he made a video, and showed it at a PC Card show in July 1995 in California.

Plaintiff counters that this evidence is insufficient for several reasons. First, Plaintiff points out that Mr. Lengyel did not know who manufactured the AIMS cards, and did not speak to whether the sale of the AIMS cards to Ricoh occurred in the United States as required by § 102(b). Second, Plaintiffs assert that there is no evidence that Mr Lengyel or Mr. Niwano used the high-speed erase mode - the feature of the AIMS card that allegedly anticipates the Asserted Claims of the '918 Patent. Indeed, Mr. Niwano testified that he could not recall any discussion about the high speed erase feature at the 1995 show, and Mr. Lengyel testified that he had no understanding of the technical details of the AIMS card, including whether it was capable of simultaneously erasing multiple blocks in different memory devices. Finally, Plaintiff asserts that Defendant has offered no

---

[3] Mr. Hiroyuki Niwano, who was the team leader during FMM's development of the AIMS card, testified that at least some of the 8 and 24 megabyte cards produced by FMM were sold to Ricoh. Mr. Niwano believes that Ricoh then sold the cards in the United States.

5

evidence that any actual offers were taken or sales made at the 1996 trade show.

Plaintiff's arguments, however, are misplaced. The on-sale bar applies when two conditions are satisfied.: (1) the product must be the subject of a commercial offer for sale; and (2) the invention must be ready for patenting. *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 67 (1998). As to the first condition, it is not necessary that a sale be consummated for the § 102(b) bar to operate. *Bildex Inc.*, 849 F. 2d at 1464. A firm offer to sell without more may be sufficient. *Id.* In addition, there is no requirement that the offer for sale take place in the United States. *In re Caveney*, 761 F. 2d 671, 677 (Fed Cir. 1985). Rather, the offer must just be directed to an entity in the United States. *Id.* Finally, the second condition can be satisfied by proof of reduction to practice. *Pfaff*, 525 U.S. at 67.

Here, Defendant has provided evidence that the Fuji AIMS system was offered for sale in the United States by Ricoh at least at the February 1996 trade show. And although proof of actual sales is not required, in its reply, Defendant offered evidence that on January 3, 1996, Ricoh shipped to Bob Francis of Walt Disney Imagineering an RDC-1 capable of using the video feature (i.e., an RDC-1 coupled with an AIMS 8 or 24 megabyte card), which was purchased. This sale is substantiated by a Ricoh business document. Moreover, Mr. Niwano's testimony that FFM sold 8 and 24 megabyte AIMS Cards to Ricoh, in combination with Mr. Lengyel's testimony that Ricoh U.S.A. sold the RDC-1 camera in a package with either an 8 or 24 megabyte AIMS card provided by FMM demonstrates that the AIMs cards in question were sold to an entity in the United States.[4]

Moreover, Plaintiff offers no legal support for its argument that a public user must understand the technical details of the invention in order for the public use bar to apply. Nor does it proffer evidence to create a dispute about whether Mr. Niwano, or Mr. Lengyel publicly used the Fuji AIMS System. Rather Plaintiff asserts that there is no evidence that these individuals used the high-speed erase mode - the feature of the AIMS card that allegedly anticipates the Asserted Claims of the '918 Patent. Assuming, *arguendo*, that public use of this exact feature is necessary, Defendant in its reply offered testimony from Mr. Niwano that he did in fact use the erase function

---

[4]Although Plaintiff has not addressed the second condition of the on-sale bar (the invention is ready for patenting), the Court notes that since the AIMS cards were reduced to practice, this condition is met. *Pfaff,* 525 U.S. at 6. ( the second condition can be satisfied by proof of reduction to practice).

6

1  at the 1995 PC Card Trade show.[5]

2  In sum, the Court finds that Defendant has established, with clear and convincing evidence
3  an offer for sale, and public use of the Fuji AIMS System in the United States more than a year
4  before the '918 Patent's filing date. The Court now turns its attention to whether the FUJI AIMS
5  System incorporated each of the limitations of the remaining asserted '918 Patent claims, including
6  specifically a "super block."

**B.    "Super Block"**

One element of independent claims one and ten of the '918 Patent, and the remainder of the Asserted Claims (all of which depend upon those claims) is the formation of "super blocks." This is the only element of the Asserted Claims at issue here.

The Court construed "super block" to mean "two or more blocks that are used to store data, the two or more blocks having addresses that are correlated with a group of logical block addresses that is determined by the number of sectors in a block."[6] The parties do not seem to disagree that when the high-speed erase mode of the Fuji AIMS System is used, four physical blocks in four different physical chips are always erased together. (Niwano Decl., ¶ 11; McAlexander Decl., Exh. A at 111 ("[w]hile the Fuji AIMS card can erase four blocks in parallel...") The parties do, however, dispute whether the four blocks are correlated with a group of logical block addresses ("LBAs").

According to Mr. Niwano, one of the inventors of the AIMS card, in the high-speed erase mode, four physical blocks in four different physical chips, totaling 16 kilobytes, are always erased at the same time. The AIMS specification shows that the erase process consists of the host transmitting a first address for a block to be erased, and a count number of blocks to be erased. The host then transmits an erase command to the controller (C0h). The controller sends to each of four possible NAND devices the erase command (60h), followed by a common NAND address, and then sends an erase commence command (D0h), which commences the erasure of all four physical blocks

---

[5]In particular, Mr. Niwano stated in a declaration that, since the AIMS card demonstrated at the show had the capacity to record only a few seconds of video, he had to use the erase function to delete each video in between demonstrations.

[6] A "block" is "erasable storage for a plurality of sectors."

7

1  at the same time. (*See* Niwano Decl., *See* Rhyne Decl., Exh. A at 67.)  Defendant contends that
2  these four blocks constitute the "super block."  In explaining how the purported "super block" is in
3  fact consistent with the Court's construction of that term, Mr. Niwano explains  that each physical
4  location in the memory portion of the AIMS card has a corresponding, unique logical address that
5  can be accessed by the host. (Niwano Decl., ¶ 16, Exh. B at FH 030894 (address map table of AIMS
6  specification).)  Mr Niwano further testified that during the high-speed erase operation, a range of
7  logical addresses are correlated with the group of four blocks being erased.  (*Id.*)

8        By contrast, Plaintiff's expert opines that the AIMS specification shows a reordering, not a
9  correlation or management of the addresses, and  the specification does not disclose the use of  a
10 group of logical block addresses for correlating with the addresses of the blocks in the chips.
11 (McAlexander Decl., Exh. A at 110.)  Rather, according to Plaintiff's expert, the AIMS card
12 controller simply sends the same common erase block address, the "NAND physical address" to all
13 four chips, which is not a grouping of LBAs.  More particularly, "by sending out an address to each
14 of the chips, there is not any attempt to manage the address in any type of common superblock [sic]
15 format such that one address goes out and therefore goes across multiple chips.  In the AIMS card,
16 these are four separate shipments of addresses." (Finst Decl, Exh. C, McAlexander Depo. at 170.)
17 Plaintiff claims that the fact that each block in the high speed mode AIMS card remains
18 independently accessible, but erasable only as a unit with blocks in other devices is inconsistent with
19 the formation of super blocks.  (McAlexander Decl., Exh. A at 111.)

20       Having considered the parties' arguments and evidence the Court concludes that there is a
21 triable issue of genuine fact as to whether the Fuji/AIMS system discloses a super block wherein
22 blocks have addresses that are correlated with a group of logical block addresses that is determined
23 by the number of sectors in a block.

25 **II.  Anticipation by the '466 Patent**

27       Defendant contends that the '466 Patent discloses all of the limitations of the Asserted
28 Claims, including the element of a "super block."  According to Defendant  the "tracks" disclosed by
the '446 Patent are functionally the same as the portions of memory defined in the '918 Patent as

8

1  super blocks. More particularly, Defendant's expert testified that the storage for each of 20,480-byte
2  "track" of data maintained by the host computer in the '466 Patent is distributed over five flash
3  memories, each of which holds four Kbytes of the track. Because the erase blocks of each of those
4  memories is four Kbytes, each erase block holds eight of the '466 Patent sectors within its sixteen
5  pages (i.e., '918 sectors). Defendant also points out that the erase blocks depicted in the '466 Patent
6  are configured identically to the super blocks depicted in the '918 Patent, and argues that this is
7  further evidence that the '466 Patent discloses super blocks. Defendant also cites to a conversion
8  table in the '466 Patent which shows the "correspondence between the logical addresses (track
9  numbers and sector numbers) specified by the host CPU and the real memory addresses (chip
10 numbers, block 10 numbers, and page numbers) for accessing the flash EEPROMs 11-0 through 11-
11 4 is defined." ('466 Patent col. 9, lns. 14-21.) Defendant further argues that since the logical
12 addresses are "track numbers and sector numbers" (id. at col. 9, lns. 14-21), not simply track
13 numbers, the logical addresses are determined by the number of sectors in a block.

14     Plaintiffs first counter that while the '918 Patent claims a method of improving system
15 performance using the "super block" architecture, the '466 Patent describes a way to arrange
16 EEPROMs so that when used as a replacement for a magnetic disk drive, the EEPROMs can be
17 accessed in parallel. That the '466 addresses a different problem, however, does not defeat
18 Defendant's anticipation argument.

> A reference may be from an entirely different field of endeavor than
> that of the claimed invention or may be directed to an entirely different
> problem from the one addressed by the inventor, yet the reference will
> still anticipate if it explicitly or inherently discloses every limitation
> recited in the claims.

*In re Schreiber*, 128 F. 3d 1473, 1478 (Fed. Cir. 1997). The real issue here is whether the '466 Patent discloses a "super block." On that note, according to Plaintiff's expert, five ERPROMs are arranged so that one block in each can store eight sectors of the track, and the host issues consecutive addresses within the same track in order to achieve this parallelism. Plaintiffs further contend that, by contrast, the '918 super blocks are grouped to store data independently of whatever existing disk access scheme of the host there may be. The '466 tracks, on the other hand, already exist in the address space on the host side, and the flash EEPROMs are merely arranged to take

advantage of the track structure. Plaintiff's expert further states that super blocks do not depend on the host's "limiting consecutive sectors to be accessed in the same track." Rather, he continues, the super blocks store data and can be erased regardless of the way or method in which the host accesses the sectors.

Plaintiff also proffers that the number of EEPROM blocks that are erased in parallel in the '466 Patent is variable and determined by the amount of data sent by the host. For example, if the host sends only one block of data (eight sectors), only one block of EEPROM will be erased. By contrast, the size of a super block is fixed and is "determined by the number of sectors in the block." The EEPROM chips are arranged to store a track, which allows the host to write to and erase a variable number of blocks depending on how much data is stored in the track. Plaintiffs claim that the variable nature of the system disclosed in the '466 Patent precludes the correlation of a group of logical block since in the variable number of blocks that are erased is not determined by the number of sectors in a block. In other words, the number of sectors that can be erased is not limited to a predetermined group.

The Court once again concludes that there is a triable issue of genuine fact as to whether the '46 patent discloses a super block as that term has been construed by the Court. Plaintiff has proffered evidence that, among other things, the number of EEPROM blocks erased is dependant on the amount of data sent by the host and not on the number of sectors in a block. Moreover, the parties' experts disagree on whether the '466 Patent teaches the formation of a super block. As such, summary judgment based on a finding of anticipation by the '466 is inappropriate.

**III.    Anticipation by the '878 Patent.**

    **A.    User Data and Overhead (i.e., a Sector) in Each of Two Memory Devices**

The Court construed the term "sector" in the '918 Patent as: "a unit of memory containing user data and overhead." Overheard consists of data such as the error correction information, block address fields, and flag fields. Plaintiff's expert opined that the '878 Patent does not anticipate the Asserted Claims of the '918 Patent because it does not disclose the existence of both user data and overhead in each of two memory devices. As such, argues Plaintiff, the '878 Patent cannot disclose

10

1 "blocks of sectors," or "two selected blocks including a first selected block located in a first
2 nonvolatile memory device and a second selected block located in a second nonvolatile memory
3 device." Defendant asserts that Claim One of the '878 Patent states there is first "row portion" in
4 the first memory unit, and a second "row-portion" in the second memory unit, and Claim Six
5 specifies that "each of the said first and second portions includes storage space for overhead."
6 Plaintiff, however, correctly points out that Defendant reads Claim Six out of context. Read
7 properly, Claim Six merely discloses that both the first row-portion and the second row-portion are
8 *capable* of storing overhead. It does not state that each row-portion holds all of the overhead data
9 associated with its user data such that a complete sector - user data and overhead - is stored in each
10 of the two memory devices at the same time.

11 Defendant also points to Figure 13 of the '878 Patent, which Plaintiff's expert concedes
12 shows the error correction portion of a sector's overhead data stored with its associated user data the
13 first memory device, and a second sector of user data and its associated overhead data stored in the
14 second memory device at the same time. However, Plaintiff's expert opines that Figure 13 depicts
15 storing only a portion of a sector's overhead (the error correction information) with its associated
16 user data in the first memory device, but the rest of the associated overhead (e.g., flag information)
17 is stored in the second memory device. Since not all of the associated overhead is stored in the same
18 memory device as its associated user data, Plaintiff contends that the '878 Patent does not disclose
19 "sectors," and consequently cannot disclose blocks of sectors in each memory device.

20 The '878 Patent itself bolsters Plaintiff's position. "It is a further object of this invention to
21 store overhead information associated with two sectors in one of the two nonvolatile memory
22 semiconductor devices. '878 Patent, col. 3, lns. 64-67. The Patent later reiterates [e]ach nonvolatile
23 memory device is defined by a row of memory locations wherein corresponding rows of at least two
24 semiconductor devices maintain two sectors of information therein with the overhead information
25 relating to the two sectors maintained in one of the memory rows of the nonvolatile memory device.
26 *Id.* at col. 4, lns. 25-31.

27 The Court finds that Plaintiff has offered sufficient evidence to create a triable issue as to
28 whether the '878 Patent discloses both user data and overhead (i.e., a sector) in each of two memory

11

devices.

### B. "Super Blocks"

Defendant argues that Figure 13 of the '878 Patent shows that it discloses a super block. More particularly, the '878 Patent describes a memory storage system comprised of "blocks" ("'878 blocks"), "sub-blocks," and "row-portions." According to Figure 7 and its accompanying description, the '878 memory bank includes a plurality of '878 blocks, each of which has a virtual physical block address ("PVBA"). Each '878 block is comprised of a first sub-block of the first flash memory chip and a second "sub-block" of the second flash memory chip. The corresponding "sub-blocks" that comprise an '878 block are identified by the same PBA. Each '878 block also contains a plurality of N memory row locations. ('878 Patent, Figure 7 and col. 7, ln. 66- col. 8, ln. 13.) Defendant contends that the '878 block corresponds to a '918 super block, a sub-block corresponds to a '918 block, and a memory row location corresponds to a '918 sector. Further, according to Defendant, the '878 patent discloses a correlation between the logical addresses specified by the host, and physical addresses of the blocks in the flash chips, citing to Figure 8A of the '878 Patent which exemplifies an LBA-PBA map used to translate a modified version of the host provided LBAs to PBAs. Finally, Defendant point to the testimony of Ms. Petro Estakhri, a named inventor on both the '878 and '918 Patents, to support its argument that the '878 block is the same thing as a super block:

> . . .the only problems with this is at the time that '878 was filed, we used the block, the word "block" for our super block because we didn't have a good term for it. Later on, that's why in teh '879 we started calling it super block because we realized it started to cause confusion of what actual block is and what super block is.

(Faragi Decl., Exh. Q at 545:10-17.)

Addressing Mr. Estakhri's testimony, Plaintiff contends that what Defendant offers is incomplete, and fails to capture the distinction that Mr. Estakhri made between the blocks shown in the '878 Patent, and the super blocks claimed in the '918 Patent. Plaintiff then cites to portions of Mr. Estakhri's deposition where he states that a block is correlated and a super block is not correlated.

> A. Okay. A block is a physical, is one or more unit of erase, that's

12

> block, which has one or more – each unit of erase has one or more sectors. That's the block between the flash
>
> Q. And that's a physical location within the flash.
>
> A. Yes, it is, but it's correlated to the group of LBAs.
>
> Q. So a super block is one or more blocks – I'm sorry one or more erasable units that's correlated to LBAs?
>
> A. To a group of LBAs.

(Nguyen Decl., Exh. B at 513:17-514:12.) The problem here is that Plaintiff offers no context for this testimony. Although Plaintiff contends that Mr. Estakhri is discussing the distinction between the '878 blocks, and the super block claimed in the '918 Patent, the testimony itself does not reveal this. Mr. Estakhri may very well be taking about terminology used solely in the '918 Patent for all the Court can tell. Even more problematic is that later in his deposition, as Defendants point out, Mr. Estakhri states that the inventors used the term "block" in the '878 Patent in a way that was not consistent with how that term is understood in the industry. As such, that Mr. Estakhri described "block" as a unit of erase in his deposition does not necessarily evidence that he ascribed the same definition to the term as used in the '878 Patent. According to his own testimony, he did not:

> I said here [in the '878 Patent] block really means super block. At the time we were doing this patent, we called it a block because we didn't have a better name for it. And later on we realized that using the same terms as what really actually, the block in the actual industry is used, we changed it to super block.

(Faragi Decl., Exh. Q at 54524-546:6.)

Plaintiff also, however, contends that the '878 Patent does not disclose a super block such that the two or more blocks comprising the super block have addresses that are correlated with a group of logical block addresses. According to Plaintiff's expert, the '878 Patent describes a nonvolatile memory architecture in which two sub-blocks are identified by the same VPBA, and the VPBA identifies a block within the memory bank. Plaintiff asserts that Defendant has failed to identify anything in the '878 Patent that teaches the correlation between a group of logical addresses and the VPBA.

The Court concludes that there is competing testimony over whether the '878 Patent

13

discloses a super block. Defendant provides testimony from one of the named inventors of both the '878 and '918 Patents that indicates the '818 blocks are the same, or functionally the same as the '918 super block. Plaintiff, on the other hand, provides expert testimony that a grouping of sub blocks using a single physical address does not meet the "super block" claim limitation since the sub blocks do not have addresses that are correlated with a group of logical block addresses. In sum, the Court concludes that there is a genuine issue of material fact as to whether the '878 Patent discloses a super block as the Court has construed that term with respect to the '918 Patent.

**IV.    Dependant Claims 2, 4, 7-9, and 11-12 of the '918 Patent**

Claims 2, 4, 7, 8, and 9 are all dependant from Claim 1. Since there are triable issues as to whether Claim 1 is anticipated by the prior art, then there are necessarily triable issues as to whether these dependant claims are also anticipated. Similarly, because Claims 11 and 12 are dependant on Claim 10 and there are triable issues as to Claim 10, then there are triable issues as to Claims 11 and 12. As such, Summary Judgment of these claims is inappropriate.

**CONCLUSION**

For the foregoing reasons, the Court **DENIES** Defendant's Motion for Summary Judgment.

**IT IS SO ORDERED.**

Dated: March 1, 2007

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE